# IN THE SUPREME COURT OF TEXAS

No. 10-0235

IN RE STATE OF TEXAS, RELATOR

ON PETITION FOR WRIT OF MANDAMUS

**Argued March 3, 2011**

CHIEF JUSTICE JEFFERSON delivered the opinion of the Court.

After the State sought to condemn a tract of land, the owners subdivided the property into eight separate parcels. The trial court then severed the case into eight different proceedings. The State contends that the severance was improper, and it seeks a writ of mandamus requiring the trial court to vacate the order. Because the severance would require eight trials where only one is appropriate, and because it would preclude the State from presenting relevant valuation evidence, we conditionally grant the writ.

## I. Background

The State of Texas filed a petition to condemn a tract of land and a drainage easement from its owners, the Laws family. The State sought to acquire a 39.619 acre fee tract as well as a 0.23 acre drainage easement, which would come out of the Lawses' 185.835 acre property in Travis County. The property was to be used in the construction of State Highway 130. On the same day that it filed its condemnation petition, the State also filed a notice of lis pendens, giving notice of

the pendency of a suit affecting the Lawses' land.  *See* TEX. PROP. CODE § 12.007 (authorizing the filing of a notice of lis pendens in eminent domain actions).

A Special Commissioner's hearing was set, but five days before the hearing, nine separate limited liability corporations filed nine separate Pleas in Intervention and Suggestions of Succession.[1]   Each LLC alleged a justiciable interest in the case as successor in title to property being condemned in the suit.  The assertion of interest was the result of a complex series of transactions.  In all, some fifty-one acres of the Lawses' property, including all of the land subject to the condemnation petition, had been subdivided by twenty-four special warranty deeds and split among three ownership groups, each of which consisted of three investing LLCs.  After these transactions, the Lawses no longer owned a direct interest in any of the land against which the State had filed, their interest now being a result only of their membership in the various LLCs.  In this manner, the Lawses subdivided their original property into eight separate tracts, each of which contained some of the land being condemned.

After the subdivision, the State added the nine intervenors as parties claiming an interest in the Acquisition, but the State nonetheless continued to proceed against the Acquisition as a single plot of land.  At the Special Commissioners hearing, the Lawses and the LLCs were represented by the same counsel.  The State's appraisal expert testified at the hearing that because of the lack of significant retail and commercial development in the area, the property should be appraised as a single unit and that its best and highest use was to hold the frontage for future commercial use.  On

---

[1] The nine LLCs were Creedmoor Investments, LLC; Prudent Path Equity Group, LLC; Holcombe Ranchland Investments, LLC; Ranch Gone, LLC; Frugal Choice Investments, LLC; Holcombe Prairie Holdings, LLC; Creedmoor Holdings, LLC; Sentimental Asset Holders, LLC; and Holcombe Family Holdings, LLC.

this basis, the State appraised the land at $0.65 per square foot and valued the whole property, including the drainage easement, at $1,155,693.

The Lawses' appraiser, rather than value the property as a single economic unit, appraised each of the eight subdivided tracts separately. He determined that the best and highest use of each of the tracts was as highway frontage commercial property. On this basis, he recommended total compensation of $4,145,000. The Special Commissioners issued an award of $2,487,991, which, at the Lawses' request, was apportioned among the eight tracts. The Lawses and the State filed various objections to the award, and the case was transferred to the County Court at Law in Travis County for trial on the appeal of the Commissioners' award. *See* TEX. PROP. CODE § 21.018. The State filed a Notice of Deposit and tendered the award into the court's registry, and the trial court granted the LLCs' motion to withdraw the funds. The Lawses filed disclaimers of interest in the Acquisition and award.

Before trial in the county court at law, the various intervening LLCs filed eight motions to sever, one for each of the tracts into which the property had been subdivided, arguing that there was no unity of ownership between the tracts. At the hearing on those motions, the LLCs did not introduce any valuation evidence. Over the State's objections, the court signed eight orders severing the single cause of action into eight separate actions. The State unsuccessfully sought mandamus relief from the court of appeals. 2010 Tex. App. LEXIS 2377, *1.

## II. Mandamus

The State asks us to order the trial court to vacate its severance order.[2] Generally, mandamus relief is appropriate only when (1) there has been a clear abuse of discretion by the trial court, and (2) there is no adequate remedy on appeal. *In re Olshan Found. Repair*, 328 S.W.3d 883, 887 (Tex. 2010). We will consider these two requirements in turn.

Courts permit severance principally to avoid prejudice, do justice, and increase convenience. *F.F.P. Oper. Partners v. Duenez*, 237 S.W.3d 680, 693 (Tex. 2007). In light of these fundamental principles, we have enumerated several requirements for proper severance: (1) the controversy must involve multiple causes of action, (2) the severed claim would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim must not be so interwoven with the remaining action that they involve the same facts and issues. *Guaranty Fed. Savings Bank. v. Horseshoe Oper. Co.*, 793 S.W.2d 652, 658 (Tex. 1990); *see also* TEX. R. CIV. P. 41.

Assuming the validity of the conveyances,[3] we focus particularly on the issue of interrelatedness, *see Guaranty Fed.*, 793 S.W.2d at 658, keeping in mind the importance of doing justice and avoiding prejudice. *See F.F.P.*, 237 S.W.3d at 693. The Lawses sought to have one trial separated into eight, but in each case, the legal and factual issues would be much the same. The legal issues raised in the eight trials would be essentially identical, and, because the land was all

---

[2] The Texas Farm Bureau submitted a brief as amicus curiae in support of the Lawses. SH 130 Concession Company, LLC, and Travis County submitted briefs as amicus curiae in support of the State.

[3] The State asserts that the conveyances by which the Lawses divided their property are invalid. Because we conclude that the severance was improper even if the conveyances were valid, and because the State raised the invalidity argument for the first time at this Court, we assume the conveyances' validity and analyze the case on that basis. The State also argues that severance was improper because of the doctrine of lis pendens, but because we resolve this issue on the basis of the claims' interrelatedness, we do not reach the lis pendens argument.

originally part of a single plot, the factual valuation testimony would likely be very similar, even if the value of the different parcels varied somewhat.[4] Both the Lawses and the State would thus pay the same lawyers to argue, and same experts to testify, in eight separate cases, an issue that could be tried once. Such duplication is inconvenient, and, worse, prejudicial to the State, which has a right to offer evidence that the entire property being taken should be valued as a single economic unit. *See State of Texas v. Windham*, 837 S.W.2d 73, 76 (Tex. 1992).[5] Because of this, and because of the waste involved in having valuation experts give testimony eight times that they could give once, we hold that the trial court abused its discretion by ordering a severance that, by breaking up a deeply interrelated set of legal and factual issues, prejudices the parties and causes great inconvenience. *Cf. F.F.P.*, 237 S.W.3d at 693; *Guaranty*, 793 S.W.2d at 658.

Because the trial court abused its discretion, we must consider whether the State has an adequate remedy by appeal. If it does not, mandamus is proper. We assess the adequacy of an appellate remedy by "balancing the benefits of mandamus review against the detriments." *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex. 2007). In performing this balancing, we look at a number of factors, among them "whether mandamus will spare litigants and the public 'the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings.'" *Id.*

---

[4] As previously noted, none of the LLCs presented valuation evidence at the hearing on the motions to sever. Thus, there is no evidence in the trial court that any of the tracts had a different valuation from the others or that any of the conveyances had economic substance, such as a bona fide arms-length sale to a third party.

[5] Such a right might be diminished in severed suits. If the State were forced to proceed in eight separate lawsuits against eight separate owners, it is unclear on what basis it could offer *Windham* evidence that the proper economic unit by which to value a particular parcel includes other land not part of that condemnation suit and not commonly owned with the land being condemned. However, a single suit would permit the State, where it has condemned land all under common ownership at the time the condemnation petition was filed, to offer evidence that the entire condemned parcel should be valued together, thus preserving its *Windham* right.

(*quoting In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004)). Thus, in *Team Rocket*, we granted mandamus where the trial court's ruling would allow a plaintiff to refile his case "in county after county . . . inevitably result[ing] in considerable expense to taxpayers and defendants." *Id.* Because the trial court's order "subject[ed] taxpayers, defendants, and all of the state's district courts to meaningless proceedings and trials," we held that "requiring defendants to proceed to trial in the wrong county" could not be considered an adequate remedy. *Id.* Similarly, in *In re Masonite Corp.*, we considered whether mandamus was appropriate to reverse a trial court's order that severed two suits into sixteen different cases that were transferred to sixteen different counties. *In re Masonite*, 997 S.W.2d 194, 196 (Tex. 1999). Conditionally granting mandamus, we held that the appellate remedy was inadequate because, while some parties might be able to appeal, such appeal would be "no remedy at all for the irreversible waste of judicial and public resources that would be required here if mandamus does not issue." *Id.* at 198.

We believe that the circumstances of this case also make the appellate remedy inadequate because of the enormous waste of judicial and public resources that compliance with the trial court's order would entail. Requiring eight separate suits here, when only one is proper, would be a clear waste of the resources of the State, the landowners, and the courts.[6] For this reason, we hold that the State lacks an adequate remedy by appeal and conditionally grant the writ of mandamus.

---

[6] The Lawses admit as much. At the Special Commissioners Hearing, the Lawses' attorney stated, in reference to the division of the property: "this exercise that we've gone through, to deed out the property, is a waste of money and it's a waste of time, and it's something that—that shouldn't happen."

## III. Valuation

The Lawses subdivided their property and sought severance based on a belief that its highest and best use was as multiple parcels. Though they have called the procedural wrangling in this case a waste of time and money, they pursued it out of an "abundance of caution" due to a fear that our opinions in *City of Harlingen v. Sharboneau*, 48 S.W.3d 177 (Tex. 2001), and *State of Texas v. Willey*, 360 S.W.2d 524 (Tex. 1962), would prevent them from seeking a valuation based on the subdivision. *Willey* and *Sharboneau* are distinguishable.

In *Willey*, the State condemned a 3-acre portion of Willey's 104-acre property. At the condemnation trial, Willey sought to admit evidence that the best and highest use of the 3-acre tract was "subdivision into residential homesites, with some commercial sites." *State v. Willey*, 351 S.W.2d 904, 905 (Tex. Civ. App.—Waco 1961), *rev'd*, 360 S.W.2d 524 (Tex. 1962). We held that Willey could not admit such evidence because "at the time of the taking . . . there had been no subdivision or development of the 104-acre tract in question." *Willey*, 360 S.W.2d at 524. We further held that "one seeking to prove the value of such a tract of land may not show what the price of the lots would be if subdivided, or show the price for which already subdivided lots were selling." *Id.* at 525. In *Willey*, we relied on *City of Austin v. Cannizzo*, 267 S.W.2d 808, 816 (Tex. 1954), which held that, because a lot was undeveloped and unimproved, "[o]pinion testimony as to the front-foot value of nonexistent lots in a hypothetical subdivision is too speculative to be admitted as direct evidence of market value." As in *Willey*, the landowners in *Cannizzo* were seeking valuation of their property as if it were a developed, primarily residential, subdivision. *See City of Austin v. Cannizzo*, 260 S.W.2d 54, 58 (Tex. Civ. App.—Austin 1953), *rev'd*, 267 S.W.2d 808.

7

Unlike *Willey* and *Cannizzo*, however, the Lawses are not seeking valuation on the basis of the residential subdivision of their undeveloped property. They seek something much simpler. The property that the State took from the Lawses is primarily highway frontage, and their appraiser testified that the highest and best use was as several individual tracts that could be sold as highway frontage commercial property. This was based on their belief that similar property in the area was sold not in bulk but, rather, in somewhat smaller, commercial-sized parcels.

In *City of Harlingen v. Sharboneau*, 48 S.W.3d 177 (Tex. 2001), we held that a property owner could not value his property according to the so-called "subdivision development method" because such a valuation included substantial speculation. The method used by the landowner in *Sharboneau* was complex: it started with the condemnee's undeveloped, 10-acre parcel; assumed that it could be divided into 44 lots; estimated the sales prices of those lots; subtracted sale and development expenses, the developer's profit, and the costs to make the lots suitable for residential construction; applied a "discount rate to the annual net sales proceeds to reflect the interest rate necessary to attract debt and equity capital for the development"; and arrived at value for the tract. *Id.* at 180–81. A method such as this requires numerous speculative inferences because the value of a small residential parcel is based on a number of factors which, in an undeveloped property, do not exist. These include such things as the costs of planning, platting, development, and marketing. In a 10-acre tract like that considered in *Sharboneau*, it is unlikely that a 1/44th-tract lot would be bought for residential purposes unless the entirety of the residential subdivision had been planned and created, and substantial funds had been invested. Inferences like these are unnecessary to support the sale of parcels such as those into which the Lawses divided their property. The costs

8

of dividing raw land are insubstantial. If the Lawses were to offer evidence that the typical size of highway-frontage commercial parcels was similar to their subdivided parcels, and that those parcels were similarly appropriate for that use, it would not be speculative to permit them to admit valuation evidence on that basis. Of course, the State would be permitted to offer its own evidence that the land was best valued as a single unit. *See Windham*, 837 S.W.2d at 76.

Our precedents support this sort of valuation testimony. In *State v. Meyer*, 403 S.W.2d 366 (Tex. 1966), we considered how to value a 14-acre strip of property that the State condemned out of Meyer's 103-acre tract. Though Meyer stipulated that there had been no remainder damage, the State attempted to value the 14-acre strip based on the value of the entire 103-acre plot. It therefore arrived at a per-acre value for the whole property and multiplied it by the 14 acres to be taken. Meyer argued, however, that the remainder could not be considered and that the 14-acre plot had to be considered as its own economic unit. Moreover, because it was highway frontage, unlike most of the 103-acre plot, it was more valuable than the averaged per-acre value of the whole property. We agreed with Meyer, writing that "it is beyond dispute that the land being condemned had, at the time of the taking, a significantly higher per acre market value than the land not being condemned which lay further from the highway." *Id.* at 375. Therefore, the "value of the part taken should be ascertained by considering such portion alone, and not as a part of the larger tract." *Id.*

We expanded upon our *Meyer* analysis in *Windham*. There, the state condemned a 110-foot-deep, 2-acre plot out of Windham's 19-acre property. Windham argued that the 2 acres that the State condemned was not itself a self-sufficient economic unit and therefore sought valuation of a 200 foot deep strip consisting of 3.84 acres, which he argued would, unlike the condemned strip, be valuable

9

as a single unit suitable for commercial development. We permitted Windham's valuation theory but held that he alone could not define the suitable economic unit. *Windham*, 837 S.W.2d at 77. Accordingly, we allowed the State to present its own expert testimony that the proper economic unit was different and that there was no demand for such subdivision. *Id.* We wrote:

> When the severed portion of the land can be considered as an independent economic unit, the market value can be determined without reference to the remainder. A different situation arises, however, when the portion of the land taken by the State, considered without reference to the remainder, cannot be considered an independent economic unit reflecting the highest and best use of the property and would thus deprive the land owner of adequate compensation for the part taken if considered solely as severed land. In such instances the market value must necessarily be determined by considering some portion or all of the remainder in order to construct an economic unit. . . .

> . . . In deciding market value the jury is permitted to consider all of the uses to which the property is reasonably adaptable and for which it is, or in all reasonable probability will become, available within the foreseeable future. Here the trial court properly instructed the jury to consider all uses to which the property is reasonably adaptable, including its highest and best use. If Windham is permitted to present evidence of the market value of the part taken utilizing a larger tract than that sought by the condemning authority based on its theory of the highest and best use of the property, then the State should be allowed to present evidence based on its competing theory of the highest and best use the property. It is then for the jury to decide which evidence to accept and which to reject in deciding the ultimate issue of market value.

*Id.* at 76–77 (citations omitted).

Similar reasoning is applicable here. The State believes that the ideal economic unit is the entire condemned tract, the highest and best use of which is to hold as investment for future development. The State is permitted under *Windham* to offer this testimony. The Lawses, like Windham, believe that the condemned tract is an inferior economic unit. Where Windham thought the proper unit was larger than the condemned tract, however, the Lawses believe that the tract to

10

be condemned contains several self-sufficient economic units. If they have non-speculative evidence to support this contention, they should be permitted to offer it at trial. Though the State has a right to define the property being taken, it does not have the power to constrain the owners' evidence of competing conceptions of the best economic unit by which the taken property should be valued.

## IV. Conclusion

The trial court's severance order prejudices the State's right to offer its valuation evidence and would cause needless duplication of legal services and expert testimony, wasting not only the parties' resources but those of the public at large. Accordingly, we conditionally grant the writ of mandamus and direct the trial court to vacate its severance order. We are confident the trial court will comply, and our writ will issue only if it does not.

_____
Wallace B. Jefferson
Chief Justice

OPINION DELIVERED: August 26, 2011

11